# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

FIMCO, INC.,

          Plaintiff,

vs.

CHAD FUNK,

          Defendant.

No. C16-4109-LTS

**ORDER ON MOTIONS FOR
SUMMARY JUDGMENT**

_____

## I. INTRODUCTION

This case is before me on a motion (Doc. No. 42) for summary judgment filed by defendant Chad Funk and a motion (Doc. No. 44) for partial summary judgment filed by plaintiff FIMCO, Inc. (FIMCO). Both motions are resisted and have been fully-briefed. I find no need for oral argument.

## II. PROCEDURAL HISTORY

FIMCO filed this action in the Iowa District Court for Woodbury County on July 14, 2016. FIMCO alleges that Funk, a former employee, breached a non-compete agreement (Count I), misappropriated trade secrets (Count II) and breached certain fiduciary duties owed to FIMCO (Count III). Doc. No. 3 at 3-4. FIMCO seeks monetary damages and injunctive relief. *Id*.

Funk filed a notice (Doc. No. 2) of removal to this court on August 17, 2016, and filed an answer (Doc. No. 5) on August 24, 2016. In his answer, Funk admits that he signed the non-compete agreement, asserts that the court must apply Nebraska law and contends that the agreement is unenforceable under Nebraska law.

The parties filed their motions for summary judgment on June 30, 2017. Doc. Nos. 42, 44. On July 21, 2017, both parties resisted each other's motions. Doc. Nos. 48, 51. On August 4, 2017, Funk filed a revised brief (Doc. No. 53) in support of his motion. Each party then filed reply materials. Doc. Nos. 55, 57.

## III.   RELEVANT FACTS

Unless otherwise noted, the parties do not dispute the following facts:

### A.    The Parties' Relationship

Funk is a resident of Nebraska and has lived and worked in Nebraska at all times relevant to this dispute. FIMCO is an Iowa corporation with its principal place of business in South Dakota. Doc. No. 3 at ¶ 4. FIMCO recruited Funk through its employees based in South Dakota and Kansas, and negotiations for Funk's employment took place electronically between persons in Nebraska, Kansas and South Dakota. Doc. No. 54 at 18; Doc. No. 51-3 at 48. At the outset of his employment as a sales representative for FIMCO, and as a condition of that employment, Funk signed a non-competition and confidentiality agreement (agreement) in Columbus, Nebraska, on September 16, 2013. Doc. No. 51-3 at 47. FIMCO's President and COO, Dave Wipson, later signed the agreement at FIMCO's headquarters in South Dakota. *Id.* Among other things, the agreement provided as follows:

1.     Non-Competition.

1.1    Employee acknowledges and recognizes the highly competitive nature of the businesses of Company and its affiliates and accordingly agrees as follows:

1.1.1 During employment and, for a period of one year following the date Employee ceases to be employed by Company (the "Restricted Period"), Employee will not, whether on Employee's own

behalf or on behalf of or in conjunction with any person, firm, partnership, joint venture, association, corporation or other business organization, entity or enterprise whatsoever ("Person"), directly or indirectly solicit or assist in soliciting in competition with Company, the business of any client or prospective client:

        A.    with whom Employee had personal contact or dealings on behalf of Company;

        B.    with whom employees reporting to Employee have had personal contact or dealings on behalf of Company; or

        C.    for whom Employee had direct responsibility.

1.1.2 During the Restricted Period, Employee will not directly or indirectly:

        A.    engage in any business that competes with the business of Company or its affiliates (including, without limitation, businesses which Company or its affiliates have specific plans to conduct in the future and as to which Employee is aware of such planning) in any geographical area that is within 100 miles of any geographical area where Company or its affiliates manufactures, produces, sells, leases, rents, licenses or otherwise provides its products or services (a "Competitive Business");

        B.    enter the employ of, or render any services to, any Person (or any division or controlled or controlling affiliate of any Person) who or which engages in a Competitive Business;

        C.    acquire a financial interest in, or otherwise become actively involved with, any Competitive Business, directly or indirectly, as an individual, partner, shareholder, officer, director, principal, agent, trustee or consultant; or

        D.    interfere with, or attempt to interfere with, business relationships (whether formed before, on or after the date of this Agreement) between Company or any of its affiliates and customers,

clients, suppliers partners, members or investors of Company or its affiliates.

      1.1.3 Notwithstanding anything to the contrary in this Agreement, Employee may, directly or indirectly own, solely as an investment, securities of any Person engaged in the business of Company or its affiliates which are publicly traded on a national or regional stock exchange or on the over-the-counter market if Employee (i) is not a controlling person of, or a member of a group which controls, such person and (ii) does not, directly or indirectly, own 5% or more of any class of securities of such Person.

Doc. No. 44-3 at 3. The restricted geographic region described in paragraph 1.1.2(A) includes South Dakota. Doc. No. 51-3 at 3.

      Funk sold FIMCO's products in Iowa, Missouri and Nebraska. *Id.* at 20. Funk testified that during his time at FIMCO, he travelled to South Dakota "once a month, maybe once every two months" and that his employment never required travel or contact with employees in South Dakota beyond those limited trips. Doc. No. 54 at 19. However, Funk sold products to two South Dakota customers (Doc. No. 51-3 at 48, 53), used a company cell phone that was taxed in South Dakota (*Id.* at 48, 54-78) and communicated with employees working in South Dakota (*Id.* at 48, 50; Doc. No. 54 at 19). Funk resigned from FIMCO on February 15, 2016, and began working as a sales representative for Heartland Agriculture, LLC (Heartland), on February 29, 2016. *Id.* at 16.

**B.**    *FIMCO and Heartland*

      FIMCO is a national retailer and wholesaler of agricultural equipment and parts used to hold and apply liquid fertilizer, herbicide and pesticides to farmland. Doc. No. 44-3 at 83. The equipment sold by FIMCO includes large tanks (for the storage of

chemicals), trailers (to transport the tanks) and sprayers (to apply chemicals to farmland). *Id.* FIMCO also sells pumps and nozzles for applying chemicals. *Id.*

Heartland is based in Nebraska. *Id.* Heartland sells some product lines that overlap with FIMCO's and sells in the same geographic region as FIMCO. Doc. No. 43-4 at 57-58, 66-68; Doc. No. 54 at 19. Specifically, Heartland sells tanks, trailers, sprayers and parts that are similar either in design or purpose to those sold by FIMCO. Doc. No. 43-4 at 85. Heartland also sells self-propelled sprayers that FIMCO does not sell; however, Heartland and FIMCO compete for some of the same customers when it comes to sprayers. *Id.* at 74, 79, 85. Additionally, Heartland sells flotation equipment designed for self-propelled products which, according to Funk, are not in competition with the flotation equipment sold by FIMCO, as Heartland's flotation equipment cannot be substituted for FIMCO's flotation equipment. Doc. No. 42-6 at 15.

Funk states that Heartland initially hired him as a sales representative, but after Funk received a cease-and-desist letter from FIMCO, Heartland designated Funk as a "self-propelled sales rep" for what Funk and Heartland considered to be the remainder of the noncompete period agreement. Doc. No. 44-3 at 13-14. Funk sold Heartland products to a customer in March 2016, after the customer had unsuccessfully tried to purchase similar products from Funk just before he left FIMCO's employment. Doc. No. 44-3 at 34-35. However, Funk did not receive a commission for this sale. *Id.* at 43.

Other relevant facts are discussed below.


## IV.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine. Put another way, "'[e]vidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel West Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The parties "may not merely point to unsupported self-serving allegations." *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008).

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving

party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. *Id.* If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

To determine whether a genuine issue of material fact exists, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citing *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996)). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick*, 90 F.3d at 1377.

On cross motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998). When the parties seek summary judgment on some of the same issues, I may consider all the parties' arguments as to each issue, keeping in mind the separate inferences that are to be drawn from each motion. *See Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 946 (S.D. Iowa 2005).

## V.    ANALYSIS

FIMCO moves for summary judgment on the issues of breach of contract and specific performance.   Specifically, FIMCO argues that the agreement is governed by South Dakota law pursuant to a forum selection clause, that the agreement is enforceable under South Dakota law and that Funk breached the agreement in light of the above-summarized facts.   As such, FIMCO contends it is entitled to a new one-year restricted period under the terms of the agreement.

Funk argues that the agreement is governed by Nebraska law pursuant to Iowa's choice-of-law principles, that the agreement is unenforceable under Nebraska law and that regardless of the controlling law, Funk is not in breach because he did not sell competing products while at Heartland.   Additionally, Funk argues that the equitable remedy of a new one-year restricted period is not available under the laws of Nebraska or South Dakota, and that if a breach occurred, FIMCO can adequately be compensated by money damages.

Funk also moves for summary judgment on FIMCO's claims for breach of fiduciary duty and misappropriation of trade secrets.   FIMCO does not resist the entry of summary judgment in Funk's favor on these claims.   *See*. Doc. No. 51-4 at 4 fn.4. As such, I will grant Funk's motion with regard to Counts II and III.

### A.    *Controlling Law*

### 1.    *Choice of Law Principles*

In a diversity action, to determine which state's law applies I must use the choice-of-law rules of the forum state.   *See, e.g. Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (the conflict of laws rules to be applied by a federal court are the rules of the forum state, because "[o]therwise the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal

8

courts sitting side by side."); *H & R Block Tax Servs. LLC v. Franklin*, 691 F.3d 941, 943 (8th Cir. 2012). Thus, I will apply Iowa's choice-of-law principles.

Iowa follows the Restatement (Second) of Conflicts of Laws. *Veasley v. CRST Int'l, Inc.*, 553 N.W.2d 896, 897-98 (Iowa 1996). When an agreement contains a choice-of-law provision, Iowa applies sections 187 and 188 of the Restatement and generally permits the contracting parties to choose the governing law. *See Pa. Life Ins. Co. v. Simoni*, 641 N.W.2d 807, 813 (Iowa 2002); *Cole v. State Auto. & Cas. Underwriters*, 296 N.W.2d 779, 781 (Iowa 1980); *Joseph L. Wilmotte & Co. v. Rosenman Bros.*, 258 N.W.2d 317, 328 (Iowa 1977). Section 187 affords great deference to the parties' choice of applicable law, displacing that choice in only two narrow circumstances:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) *The law of the state chosen by the parties to govern their contractual rights and duties will be applied*, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, *unless* either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) the application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflicts of Law § 187 (1971) (emphasis added).

9

In *Hussemann ex rel. Ritter v. Hussemann*, 847 N.W.2d 219 (Iowa 2014), the Iowa Supreme Court weighed a Florida choice-of-law provision in a post-nuptial agreement—a contract that would be unenforceable under Iowa law. Following the principles of section 187(2), the court considered whether Iowa's interest in the agreement, if any, outweighed the harm to the parties' justified expectations caused by supplanting their chosen law. *Id.* at 225-26. Deference to the parties' choice prevailed. The Court held that Iowa did not have a *materially greater* interest in the contract than Florida merely because the parties had moved to Iowa after executing the contract and because Iowa law would invalidate the contract. As a result, the parties' expectations pursuant to the contractual choice-of-law provision were not disturbed, despite Iowa's strong policy position against the type of agreement at issue. The *Hussemann* Court cited to the Restatement's comments in support of its holding:

> [The] [p]rime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract. These objectives may best be attained in multistate transactions by letting the parties choose the law to govern the validity of the contract and the rights created thereby . . . . . Giving parties this power of choice is also consistent with the fact that, in contrast to other areas of the law, persons are free within broad limits to determine the nature of their contractual obligations.

*Id.* at 223-24 (citing Restatement (Second) of Conflict of Laws § 187 cmt. e).

Notably, *Hussemann* did not decide whether Florida law would apply in the absence of a choice-of-law provision. Nor did it resolve the question of which state had the greatest interest in controlling the contract dispute, given the states' diametrically-opposed policies. Rather, looking to the language of the contract, the court found that it was clear the parties expected their agreement would be enforceable under Florida law. *Id.* at 226 ("The parties do not intend that . . . any other event or events or change of conditions shall in any way [a]ffect or change the terms of this Agreement . . . . [W]e

doubt that parties . . . would expect that contract to be nullified simply because they move to another state.").

In *Modis, Inc. v. Viet*, 4:15-CV-001100-SMR-RAW, 2015 WL 12862929 (S.D. Iowa June 5, 2015), the Southern District of Iowa applied *Hussemann* to an employment agreement containing a Florida choice-of-law clause. The court noted that Iowa does not always evaluate each step of the Restatement (Second) of Conflicts of Laws section 187(2) test. *Modis*, 2015 WL 12862929 at *7. However, to resolve the dispute in *Modis*, the court considered (a) whether the chosen forum had a substantial connection to the parties' dispute and (b) whether any other state had a materially greater interest in the contractual dispute. *Id.* at *7-10. I will consider the same issues, keeping in mind the weight that Iowa law gives to the parties' justified expectations regarding the resolution of their contract disputes.

Here, Funk challenges the enforceability of the contract, which cannot be resolved by an explicit provision in the agreement directed to that issue. *See, e.g. Pro Edge, L.P. v. Gue*, 374 F. Supp. 2d 711, 737 (N.D. Iowa 2005); *see also* Restatement (Second) of Conflicts of Law § 187 cmt. d. Therefore, the parties' contractual choice of South Dakota law applies *unless* an exception to the rule honoring the parties' choice is established. Funk argues that South Dakota has only a meager relationship to the parties or the transaction while Nebraska has more significant connections to the present dispute. Doc. No. 46 at 4-5. Funk also states that there is no other reasonable basis for the choice of South Dakota law. *Id.* at 7. Therefore, Funk concludes, Nebraska law should apply.[1] *Id.* at 6-7. FIMCO argues that the exceptions to applying the parties'

---

[1] Funk relies heavily on *DCS Sanitation Mgmt., Inc. v. Castillo*, 435 F.3d 892 (8th Cir. 2006). In that case, the Eighth Circuit applied Nebraska's choice-of-law rules and held that Nebraska's countervailing policy against overly restrictive non-compete agreements, along with the negotiation, execution, and performance of the contract in Nebraska, created a material interest sufficient to displace the parties' chosen law (Ohio). *Id.* at 896-97. Although *DCS Sanitation*

choice of law are exceedingly narrow under Iowa law and do not apply here.   Doc. No.
51-4 at 9-19.

## 2.      Analysis

As noted above, under Iowa's choice-of-law principles, the parties' chosen law,
South Dakota, controls unless either (a) South Dakota has no substantial relationship to
the parties or the transaction, or (b) Nebraska has a materially greater interest in
controlling the contract.   I will address each proposition separately.

### a.      South Dakota's relationship to the parties and the contract.

"When the state of the chosen law *has some substantial relationship* to the parties
or the contract, the parties will be held to have had a reasonable basis for their choice."
Restatement (Second) of Conflicts of Law § 187 cmt. f (emphasis added).   The
comments to section 187 make clear that there is no one test to determine whether a state
has a substantial relationship to the parties or the contract, listing as examples
performance in the state, the place of contracting or domicile in the state as acceptable
proof of a substantial relationship.   *Id.*   Further, underlining the respect for the parties'
choice of law, comment f states: "Contracts are entered into for serious purposes and
rarely, if ever, will the parties choose a law without good reason for doing so."   *Id.*

With that framework in mind, I note that there appears to be only one reported
case applying Iowa's choice-of-law principles in which the parties' contractual choice of
law was not honored.   In *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224 (N.D.
Iowa 1995), this court held that the fact that the plaintiff was incorporated in Delaware

---

is factually analogous to Funk's case, it is legally inapplicable.   As noted above, I must apply
Iowa's choice-of-law principles, not Nebraska's.   *Klaxon*, 313 U.S. at 496.

was not sufficient to uphold the parties' choice of Delaware law. *Id.* at 1254. The court explained:

> The contract at issue was not negotiated, entered into, or performed in Delaware, and the company's headquarters is in Georgia, not Delaware. The factors for consideration of the most significant relationship identified in § 188 of the Restatement all point instead to the application of Iowa law. The contract was to be performed principally in Iowa, with some performance in both Nebraska and South Dakota, Youngblade's primary place of business, his office, and his residence, at all material times were in Iowa, as they are now.

*Id.* Clearly, a party's state of incorporation is one factor that must be considered, along with domicile, headquarters, performance and place of contracting. *Pro Edge*, 374 F. Supp. 2d at 738-39; *Modis*, 2015 WL 12862929 at *6-7. However, mere incorporation in a state, without more, does not create a substantial relationship between that state and the parties or the transaction.

In contrast with the contract in *Curtis 1000*, the agreement here is intimately connected to South Dakota. FIMCO is an Iowa corporation, but its headquarters, principle place of business and warehouses are in South Dakota. While Funk signed the agreement in Nebraska, FIMCO signed it in South Dakota. During his employment, Funk sold products to two South Dakota customers, used a company cell phone that was taxed in South Dakota, communicated with employees working in South Dakota and travelled to FIMCO's parts plant in South Dakota. A substantial relationship can clearly be established on the basis of these factors. *See, e.g. Modis*, 2015 WL 12862929 at *6. Further, the geographic restrictions on competition in the agreement included South Dakota.

If a party does substantial business in a state, and intends to prevent competition in a state, it cannot be said that there is no substantial connection to the state. *Modis*, 2015 WL 1262929 at *6 (citing *Curtis 1000*, 878 F. Supp. At 1254; *Ferrofluidics Corp.*

*v. Advanced Vacuum Components, Inc.*, 968 F.2d 1463, 1467 (1st Cir. 1992). The record reflects that FIMCO intentionally selected South Dakota as a result of its substantial business there. *See, e.g.* Restatement (Second) of Conflict of Laws § 187 cmt. f. FIMCO claims as much in its brief, and Funk provides no reason why he would expect any other law to apply to the contract when he signed it. Thus, the first possible exception to enforcing the agreement's choice-of-law provision is not present.

### b.    *Nebraska's materially greater interest*

To determine whether Nebraska has a materially greater interest in this case such that applying South Dakota law would be contrary to a fundamental policy in Nebraska, I must consider Nebraska's interest compared to South Dakota's. Restatement (Second) of Conflict of Laws § 187(2)(b). This requires an analysis of both the quantity and quality of Nebraska's contacts with the agreement as compared to South Dakota's, as well as an analysis of the relative policy concerns each state seeks to enforce. The parties' choice of law will not be displaced if the relative interests of each state are tied, or even if Nebraska's interest marginally outweighs South Dakota's. *Pro Edge*, 374 F. Supp. 2d at 738-39. Only a *materially* greater interest is sufficient to outweigh Iowa's strong policy preference for supporting the parties' justified expectations. *See, e.g. Hussemann*, 847 N.W.2d at 225-26.

The contacts to be considered include (a) the place of contracting, (b) place of negotiating, (c) place of performance, (d) location of the subject matter, and (e) the domicile of the parties to the contract. *Pro Edge*, 374 F. Supp. 2d at 738-39. Here, the parties dispute precisely where the agreement was negotiated and executed. Although Funk signed the agreement in Nebraska, FIMCO signed the agreement in South Dakota. FIMCO recruited Funk through its employees based in South Dakota and Kansas, and negotiations for Funk's employment took place electronically between

14

persons in Nebraska, Kansas and South Dakota. As a result, the first two factors are essentially tied. *See, e.g. Pro Edge*, 374 F. Supp. 2d at 738-39.

The place of performance and location of the subject matter are less equally balanced—the vast majority of Funk's work occurred in Nebraska and Iowa, his designated sales territory. However, it is undisputed that Funk sold to two customers in South Dakota and travelled to South Dakota at least a handful of times for work. Also, Funk had regular contact with FIMCO employees in South Dakota. Although South Dakota was not within Funk's sales territory, the agreement expressly applies to any subsequent employment Funk may choose to accept in South Dakota, as South Dakota is included within the restricted territory of the non-compete provision. As a result, the third and fourth factors do not establish a *materially greater* interest in Nebraska, although they weigh slightly in Nebraska's favor. As for the final factor, the domicile of the parties is equally balanced. FIMCO is domiciled in South Dakota and Funk is domiciled in Nebraska. The five factor test set out in *Pro Edge* and similar cases does not establish that Nebraska has a materially greater interest in this case than South Dakota.

The strength of Nebraska's policy concerns also fail to establish the necessary "materially greater interest," when considered in light of Iowa's preference for enforcing the justified expectations of the contracting parties, and South Dakota's countervailing interest in encouraging business. Accepting *arguendo* that Nebraska's and South Dakota's laws concerning non-compete agreements are opposed such that applying one or the other would lead to the opposite outcome, *Hussemann* dictates that conflicting state policies are not enough, under Iowa's choice-of-law principles, to displace the parties' chosen law. 847 N.W.2d at 225-26.

In conclusion, the agreement's selection of South Dakota governing law must be enforced. Funk has not established that South Dakota has no relationship to the contract, or that it was not a reasonable choice. Nor has he established that Nebraska's interests

are materially greater than South Dakota's, such that the parties' justified expectations must be displaced. Funk's motion for summary judgment on this issue will be denied.

## B. Breach of Contract

"The elements of a breach of contract under South Dakota law are '(1) an enforceable promise; (2) a breach of the promise; and (3) resulting damages.'" *Diesel Mach., Inc. v. Manitowoc Crane Grp.*, 777 F. Supp. 2d 1198, 1212 (D.S.D. 2011) (quoting *Bowes Constr., Inc. v. S.D. Dep't of Transp.*, 793 N.W.2d 36, 43 (S.D. 2010)). With regard to the first element, the parties dispute whether the agreement is enforceable as written under South Dakota law. As for the second element, the parties dispute whether Funk's conduct constitutes a breach of the agreement.

### 1. Enforceable Promise

South Dakota generally prohibits agreements in restraint of trade. *See Comm. Tech. Sys., Inc. v. Densmore*, 583 N.W.2d 125, 128 (S.D. 1998). However, non-compete agreements are authorized by statute:

> An employee may agree with an employer at the time of employment or at any time during his employment not to engage directly or indirectly in the same business or profession as that of his employer for any period not exceeding two years from the date of termination of the agreement and not to solicit existing customers of the employer within a specified county, first or second class municipality, or other specified area for any period not exceeding two years from the date of termination for the agreement, if the employer continues to carry on a like business therein.

S.D. Codified Laws § 53-9-11. This statute is to be interpreted narrowly, as an exception to the prohibition against restraint of trade. *Am. Rim & Brake, Inc. v. Zoellner*, 382 N.W.2d 421, 424 (S.D. 1986). However, courts may enforce covenants restraining competition within the terms of the statute and may modify noncompetition

provisions to conform to the statutory mandate of section 53-9-11 by partial enforcement.[2] *Simpson v. C & R Supply, Inc.*, 598 N.W.2d 914, 920 (S.D. 1999) (modifying overbroad or vague geographical limit in non-compete contract).

FIMCO argues that the agreement does exactly what South Dakota authorizes. Funk, however, makes two arguments that the agreement is broader than section 53-9-11 permits. First, Funk argues that Subsection 1.1.2(B) is broader than permitted because, according to his interpretation, it "prevents the former employee from 'entering the employ of' '*any*' company which engages '*in any business* that competes with the business of' the employer, regardless of whether the former employee himself '*engage[s]*

---

[2] Funk argues that the agreement is indivisible and contends that South Dakota does not permit "blue-penciling" of noncompete agreements. Doc. No. 46 at 15-16. Funk is plainly wrong as to both issues. First, in spite of Funk's contentions that "the noncompete covenant itself cannot be considered divisible" and that "Section 1 clearly operates as one seamless, indivisible provision regulating post-termination competition," Section 1.2 of the agreement expressly states that the agreement is divisible:

> It is expressly understood and agreed that although Employee and Company consider the restrictions contained in this Section 1 to be reasonable, if a final judicial determination is made by a court . . . that . . . any . . . restriction contained in this Agreement is an unenforceable restriction against Employee, the provisions of this agreement shall not be rendered void but shall be deemed amended to apply as to such . . . extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

Second, the South Dakota Supreme Court has held that if "an illegal covenant is divisible, the remaining legal covenants are enforceable." *1st Am. Sys., Inc. v. Rezatto*, 311 N.W.2d 51, 56 (S.D. 1981). Further, regarding section 53-9-11, the Court has held that illegal covenants will be modified to be consistent with this statute. *See, e.g., Franklin v. Forever Venture, Inc.*, 696 N.W.2d 545, 551-52 (S.D. 2005) (detailing statutory scheme prohibiting restrictions on trade and the methods for interpreting the exceptions to the restriction); *Simpson,* 598 N.W.2d at 920 (citing *Ward v. Midcom, Inc.*, 575 N.W.2d 233, 238 (S.D. 1998); *Loescher v. Policky*, 173 N.W.2d 50, 53, 55 (S.D. 1969)).

. . . *in the same business*' as that of the employer within the meaning of" the statute. Doc. No. 46 at 14 (emphasis in original). Funk argues that this provision would prohibit Funk from working for Heartland in any capacity if Heartland competes with FIMCO in any way—an arrangement Funk argues is not permitted by section 53-9-11. *Id.* (citing *Franklin*, 696 N.W.2d at 551.

The text of section 53-9-11 permits agreements restricting employment "directly or indirectly in the same business or profession as that of his [former] employer." The provision at issue in *Franklin* prevented the employee "*in any manner, directly or indirectly* . . . from being 'an employee, proprietor, partner, shareholder, officer, manager, agent, advisor, consultant, investor, or *otherwise*, of *any* corporation, entity or business enterprise which shall construct, own, or operate a restaurant." 696 N.W.2d at 551 (emphasis in original). *Franklin* held that this term, if interpreted literally, would

> [S]weep[] into its breadth isolated, insubstantial and non-detrimental activities. It includes remote business interests that only tangentially involve the restaurant business. Its breadth goes beyond the purpose of preventing the former proprietor from unfairly competing with the new proprietor. . . to the extent that the agreement may restrain Franklin from activities which could not fairly be characterized as 'carrying on a similar business,' it is void as against public policy.

*Id.* at 551-52.

As compared to the statutory language and the language at issue in *Franklin*, the agreement between FIMCO and Funk is much closer to that of the statute. Specifically, Section 1.1.2(B) states that Funk "will not directly or indirectly . . . enter the employ of, or render any services to, any Person (or any division or controlled or controlling affiliate of any Person) who or which engages in a Competitive Business." Doc. No. 44-3 at 3. Importantly, a "Competitive Business" is defined as "any business that competes with the business of Company or its affiliates (including, without limitation, businesses which Company or its affiliates have specific plans to conduct in the future and as to which

18

Employee is aware of such planning) in any geographical area that is within 100 miles of any geographical area where Company or its affiliates manufactures, produces, sells, leases, rents, licenses or otherwise provides its products or services." *Id*.

I find that the agreement's language is consistent with the statute. Unlike the restriction in *Franklin*, Section 1.1.2(B) does not reach far beyond any reasonable or logical definition of the phrase "same business or profession," as set forth in section 53-9-11. Instead, the agreement defines "Competitive Businesses" in such a manner as to limit its restrictive scope to those businesses that actually compete, or have specific plans to compete, with FIMCO. I reject Funk's argument that Section 1.1.2(B) is more restrictive than the statute permits.[3] Funk's motion for summary judgment regarding the enforceability of this section will be denied.

Second, Funk argues that subsection 1.1.1 of the agreement renders the agreement overly broad because it proscribes solicitation of "prospective" FIMCO customers, while section 53-9-11 sanctions only agreements not to solicit "existing customers." Doc. No. 46 at 14) (citing *Rezatto*, 311 N.W.2d at 59). FIMCO responds that the agreement "qualifies the term 'prospective'" to mean only those persons or businesses with which Funk and FIMCO have an actual relationship, regardless of whether a purchase was made." Doc. No. 51-4 at 21. It is difficult to predict how South Dakota would resolve this issue. In *Rezatto*, the Court did not explain its reasoning (beyond the obvious statutory difference that Funk has pointed out) and no other case seems to illuminate the issue. Subsequent cases examining *Rezatto* suggest that it implicitly approves of covenants restricting an employee from canvassing or soliciting business from former employer's customer lists. *See, e.g., Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d

---

[3] I note that even if I could find that Section 1.1.2(B) extends beyond the boundaries of section 53-9-11, *Franklin* counsels that the agreement must be enforced to the extent of the statute. *Id.* at 552. Thus, contrary to Funk's position, Section 1.1.2(B) would not be unenforceable in its entirety if it purported to exceed the statutory scope.

1361, 1368 (8th Cir. 1991). However, *Rezatto* also stands for the principle that although an employer may prevent a former employee from "soliciting" former clients, "these clients are not parties to the contract and should be allowed to choose who they would like to do business with." *Comm. Tech. Sys.*, 583 N.W.2d at 133 (citing *Rezatto*, 311 N.W.2d at 57). These cases do not resolve the question of whether a customer who has some kind of actual relationship with FIMCO, but has not actually done business with FIMCO, could nonetheless be considered an "existing customer" within the meaning of section 53-9-11.

Ultimately, the issue Funk raises as to Section 1.1.1 may be moot. With regard to the one former FIMCO customer addressed in the parties' filings, Funk testified that he did not solicit that former customer but, instead, that the customer contacted Funk and Funk referred the customer back to FIMCO. FIMCO does not dispute this characterization of the chain of events, and further does not argue that this specific incident constituted a breach of the agreement. Thus, it does not appear that FIMCO is contending that Funk has breached the agreement as to any "prospective customer." Nonetheless, because section 53-9-11 is to be interpreted narrowly, *Am. Rim & Brake*, 382 N.W.2d at 424, I predict that the South Dakota Supreme Court would adopt Funk's interpretation as to the permissible scope of the non-solicitation restriction. As such, while I find that Section 1.1.1 is largely enforceable, it is not enforceable to the extent that it purports to prohibit Funk from soliciting any customers who are not "existing customers" of FIMCO.

### 2. Breach

Having concluded that the agreement is almost entirely enforceable, I must turn to the issue of whether Funk has breached the agreement. The agreement prevents Funk from engaging in or working for "any business that competes with [FIMCO] in any

20

geographic area that is within 100 miles of any geographic area where [FIMCO] manufactures, produces, sells, leases, rents, licenses, or otherwise provides its products or services." Doc. No. 51-3 at 3. Funk argues that he has not breached this agreement because FIMCO does not sell self-propelled products and Heartland does. Funk asserts, "FIMCO cannot be said to 'compete' with or engage in the 'same business' as any person or company that sells self-propelled products. Doc. No. 46. Funk testified that he was initially hired as a sales representative for Heartland, and was switched to the position of "self-propelled sales rep" for two years after he received a cease-and-desist letter from FIMCO. At this point, he is back to selling the full line of Heartland products. Representatives from Heartland and Funk testified that Heartland and FIMCO are not competitors in the field of self-propelled tanks, but that their product lines as a whole overlap in several respects.[4]

FIMCO responds, essentially, that Funk's argument is irrelevant. According to FIMCO, Heartland is a competing business regardless of whether FIMCO sells self-

---

[4] FIMCO asserts that these statements cannot be used to defeat a motion for summary judgment. Specifically, in their initial depositions, Gates and Funk each stated that Heartland was a competitor with FIMCO in some respects. Doc. No. 44-3 at 21-24, 57-58, 66-67. These depositions took place on May 23, 2017. On June 20, 2017, ten days before the motions for summary judgment were filed, counsel for Funk filed "errata sheets" for these depositions which purported to clarify that Heartland and FIMCO were not competitors in the line of "self-propelled products." Doc. No. 44-3 at 74, 79. FIMCO argues:

> Had the 'corrections' been made by Funk and Gates after FIMCO's Motion for Summary Judgment was filed, they likely would have been disregarded as 'shams' which could not defeat the Motion. *See K.R.S. v. Bedford Cmty. Sch. Dist.*, 109 F. Supp. 3d 1060, 1073 (S.D. Iowa 2015) ("The law in this circuit concerning 'sham affidavits' is clear: in responding to a summary judgment motion a party cannot by affidavit directly contradict deposition testimony previously given in order to create a genuine issue of material fact.").

Doc. No. 57-2 at 4-5. Although FIMCO's argument is compelling, it is unnecessary to resolve the issue here. Considering the record as a whole, the change is not as dramatic as FIMCO suggests and has no bearing on my decision.

propelled tanks, because Heartland and FIMCO have other overlapping products. The agreement does not prohibit Funk from working for competitors *only* if his work involves a competing product line, it prohibits Funk from working for competitors, period. Thus, FIMCO argues that any other interpretation of the restrictions at issue would be contrary to the agreement's plain language.

Neither party has cited cases in support of their interpretation of the contract, beyond the proposition that the plain language of the contract should control. Funk has provided no reason to read a limitation on the definition of "Competing Business" into the contract that does not exist. Funk likens his situation to Chevrolet's competition with a bike shop, because both companies sell "transportation products." This argument fails to properly analogize the competition between FIMCO and Heartland. Funk states that "[b]icycles and trucks are significantly different products, serving vastly different customers and occupying very different markets." Doc. No. 46 at 17. But self-propelled sprayers and tow sprayers are only marginally different. Funk acknowledged during his deposition testimony that the products reach the same customers for the same purposes and that FIMCO and Heartland have vast overlap between their product lines beyond the self-propelled products. Even if I accept as true Funk's statement that as a Heartland employee he sold only a product line that FIMCO did not carry, he was employed by a "Competing Business" in violation of the agreement. FIMCO's motion for summary judgment on the issue of breach will be granted.

### C.    *Specific Performance*

FIMCO argues that pursuant to the terms of the agreement, it is entitled to specific performance in the form of a new one-year restricted period. The relevant provision of the agreement states:

> Employee acknowledges and agrees that Company's remedies at law for a breach or threatened breach of any of the provisions of Section 1 or Section

22

2 would be inadequate and Company would suffer irreparable damages as
a result of such breach or threatened breach. In recognition of this fact,
Employee agrees that, in the event of such a breach or threatened breach,
in addition to any remedies at law, Company, without posting any bond,
shall be entitled to cease making any payments or providing any benefit
otherwise required by this Agreement and obtain equitable relief in the form
of specific performance, temporary restraining order, temporary or
permanent injunction or any other equitable remedy which may then be
available.

Doc. No. 44-3 at 6. FIMCO's position is that Funk has never complied with the
agreement and that it cannot be adequately compensated for Funk's breach without the
enforcement of a new restricted period under the terms of the contract. *See, e.g., Pro
Edge*, 374 F. Supp. 2d at 749-50 ("[M]ere violation of a valid covenant not to compete
supports an inference of the existence of a threat of irreparable harm . . . The Eighth
Circuit Court of Appeals has previously adopted and employed this approach without
consideration or reference to any particular state's law.") (citing *N.I.S. Corp. v. Swindle*,
724 F.2d 707, 710 (8th Cir. 1984)); *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp.
1405, 1434-36 (N.D. Iowa 1996); *Moore Bus. Forms, Inc. v. Wilson*, 953 F. Supp. 1056,
1056 (N.D. Iowa 1996)). In *Overholt Crop Ins.*, the court affirmed an injunction that
extended beyond the restricted period in a noncompete agreement, recognizing that "there
may be situations where injunctive relief extending beyond the period established by the
covenant is appropriate." 941 F.2d at 1372 (quoting *Cherne Indus., Inc. v. Grounds &
Assocs., Inc.*, 278 N.W.2d 81, 91 (Minn. 1979)).

Funk argues that equitable relief in the form of a new one-year restricted period
under the contract is categorically unavailable under Nebraska law. *Agrigentics, Inc. v.
Rose*, 62 F.3d 268, 270-71 (8th Cir. 1995) (applying Nebraska law and holding that the
expiration of the one-year noncompete period rendered equitable relief moot); *see also
DCS Sanitation*, 435 F.3d at 895 (applying Nebraska law). Funk further argues that
other courts have refused to add a new restricted period to a noncompete agreement after

the original restricted period had expired, again due to mootness. *See, e.g., Moraine Indus. Supply, Inc. v. Sterling Rubber Prods. Co.*, 891 F.2d 133, 136 (6th Cir. 1989); *Econ. Lab. Inc. v. Donnolo*, 612 F.2d 405, 409 (9th Cir. 1979).

FIMCO responds that the cases declining to extend noncompete restrictions beyond their expiration dates do not contemplate an absolute rule against such a remedy. As an example, in *Moraine* the Sixth Circuit stated that "[i]f [the employer] wanted judicially enforced specific performance of the noncompetition agreements after their stated expiration date, then Sterling should have expressly provided for such relief in the original noncompetition agreements." 891 F.2d at 136. In *JAK Prods., Inc. v. Wiza*, 986 F.2d 1080, 1091 (7th Cir. 1993), the Seventh Circuit extended a noncompete agreement beyond its expiration date because "[t]o hold otherwise would reduce the covenant from twelve to eight months." Further, as FIMCO points out, both of the Eighth Circuit cases Funk cites applied Nebraska law, which is adverse to noncompete agreements, while South Dakota law expressly permits such agreements. Notably, in *Modis*, 2015 WL 12862929 at *14, and *Curtis 1000*, 878 F. Supp. at 1283, federal district courts applying Florida and Iowa law granted injunctive relief as a remedy to enforce noncompete agreements.

The South Dakota Supreme Court has not explicitly addressed the issue of extending restrictive periods to enforce a noncompete agreement after the original term has expired. However, South Dakota explicitly authorizes specific performance of an obligation. S.D. Codified Laws § 21-9-1. Further, several cases enforcing § 53-9-11 have granted injunctive relief to enforce restrictive covenants without reference to whether the agreements at issue provided for such a remedy or whether the issue was moot due to the expiration of the restrictive time period.[5] Here, considering South

---

[5] *See, e.g. Howard Venture, LLC v. Lively*, No. Civ. 10-4072-KES, 2011 WL 2595276 (D.S.D. June 23, 2010); *Hot Stuff Foods, LLC v. Mean Gene's Enters. Inc.*, 468 F. Supp. 2d 1078

24

Dakota's express statutory authorization of noncompete agreements, and the harm that would come from allowing parties to avoid their obligations by drawing out litigation during the pendency of the obligation not to compete, I predict that the South Dakota Supreme Court would allow equitable relief in the form of a new restricted period extending beyond the expiration of the restrictive covenant. I find this to be especially true when, as here, the agreement at issue expressly provides for such relief. As a result, FIMCO's motion for summary judgment on the issue of specific performance will be granted.

## VI.  CONCLUSION

For the reasons set forth herein:

1.  Funk's motion for summary judgment (Doc. No. 42) is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** with regard to FIMCO's claims for misappropriation of trade secrets (Count II) and breach of fiduciary duties (Count III). Those claims are **DISMISSED**. The motion is **DENIED** in all other respects.

2.  FIMCO's motion for partial summary judgment (Doc. No. 44) is **GRANTED**, as follows:

a.  Based on Iowa's choice-of-law principles, South Dakota law applies to the agreement between FIMCO and Funk.

b.  The agreement is fully-enforceable under South Dakota law except to the extent it purports, in section 1.1.1, to solicit the business of any "prospective

---

(D.S.D. 2006); *Primary Surgical v. Swartout*, Nov. Civ. 06-459JRTFLN, 2006 WL 763209 (D. Minn. Mar. 24, 2006) (applying South Dakota law); *Franklin*, 696 N.W.2d 545 (S.D. 2005); *Centrol, Inc. v. Morrow*, 489 N.W.2d 890 (S.D. 1992); *Rezatto*, 311 N.W.2d 51; *Loescher*, 173 N.W.2d 50 (S.D. 1969).

client" of FIMCO.

        c.     As a matter of law, Funk breached the agreement by accepting and maintaining employment with Heartland during the agreement's one-year restricted period.

        d.     As a matter of law, FIMCO is entitled to equitable relief in the form of an order establishing a new, one-year period during which Funk must comply with the agreement.

        3.     I will conduct a telephonic status conference call with counsel on **November 3, 2017**, beginning at **9:30 a.m.**, to discuss the following questions:

        a.     What claims and issues, if any, remain for trial in light of this order?

        b.     What is the appropriate method for implementing the injunctive relief to which FIMCO is entitled?

        c.     Are there any other issues that the court should address in light of this order?

Counsel are directed to meet and confer about these issues, either in person or via telephone, prior to the status conference. To participate in the status conference call, counsel are directed to call into the bridge conference line as follows: Dial 1-877-402-9753; Enter Access Code 4189501#; Press # to enter as a participant; Enter Security Code 1230#. The call will become active upon the "host" (the Court) entering the conference bridge.

        **IT IS SO ORDERED.**

        **DATED** this 24th day of October, 2017.

                              _____
                              Leonard T. Strand, Chief Judge